## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

HAKIM NASEER,

                Plaintiff,

     v.

NURSE MCARDLE, NURSE WATERMAN,
NURSE EDGE, LORI ALSUM, ICE PAYNE,
and CINDY O'DONNELL,

                Defendants.

OPINION and ORDER

17-cv-509-jdp

---

Plaintiff Hakim Naseer, appearing pro se, alleges that he had a head injury that caused him dizziness and severe pain, but that prison officials failed to adequately treat it. They would not assess him, they intercepted his correspondence to the health services manager about this mistreatment, they kept him from being seen by a doctor, and they mishandled his grievances. He brings claims under Eighth Amendment, First Amendment, and equal protection "class of one" theories.

The group of defendants represented by the attorney general's office, whom I'll refer to as the "state defendants," has filed a motion for summary judgment on the merits of Naseer's claims. The remaining defendant, Nurse Practitioner Sandra McArdle, has filed two motions for summary judgment, one on the merits of Naseer's claims and one regarding the exhaustion of administrative remedies for what McArdle argues are brand-new claims not contained in Naseer's operative complaint. The parties have filed several other motions that I will address before considering the summary judgment motions; most of them are motions filed by Naseer in which he contends that defendants have failed to properly respond to his discovery requests and he seeks sanctions for their misconduct.

I will deny almost all of the discovery and sanctions motions filed by Naseer. The one exception is a motion for sanctions regarding the state defendants' failure to respond to a previous order granting one of Naseer's motions to compel. I'll direct the state defendants to respond on this issue. But that doesn't affect the outcome the summary judgment motions. I conclude that Naseer fails to show that defendants violated his constitutional rights. Much of Naseer's claims are focused on perceived violations of various Department of Corrections regulations, but none of those violations, or any other actions taken by defendants, are enough for a jury to find a violation of his constitutional rights. At most he shows that he was misdiagnosed by defendant McArdle. So I'll grant summary judgment to defendants on the merits of each of his claims.

PRELIMINARY MATTERS

A. **Motions to compel and for sanctions**

There are a number of motions to address before considering defendants' motions for summary judgment. Naseer previously filed a number of interrelated motions about gaps in the discovery defendants produced and asking for sanctions against defendants based on what he believed was willful misconduct or perjury by defendants or their counsel. I denied Naseer's motions for sanctions because there was no reason to think that defendants perjured themselves by disagreeing about versions of events or that minor discrepancies or omissions in discovery responses were the result of willful misconduct. *See* Dkt. 123.

Naseer has filed another series of motions for sanctions, some of which also ask to compel defendants to respond to certain discovery requests. Dkt. 107; Dkt. 121; Dkt. 133; Dkt. 135; Dkt. 193. Some of the materials Naseer seeks to compel were provided by defendants

in response, and Naseer failed to take the proper steps prior to his motion to compel for other of his requests. For the most part, Naseer's new motions for sanctions have the same problems as his previous motions: he believes that most disagreements the parties have about discovery or perceived mistakes in defendants' responses were caused by defendants' and counsel's malice toward him. But he does not provide evidence plausibly supporting that belief, so he has no grounds for sanctions.

For instance, Naseer filed a motion to compel seeking materials from McArdle indicating her "neurology credentials." Dkt. 107. I take McArdle's substantive response to be that there are no such materials beyond her existing credentials as a nurse practitioner, so I'd deny the motion to compel even if there was not a dispute about whether Naseer complied with the Federal Rules of Civil Procedure in seeking discovery and pursuing his motion to compel. In any event, the parties dispute whether Naseer properly sought to confer with McArdle's counsel before filing his motion. McArdle says that Naseer sent a "confer memo" directly to the court, *see* Dkt. 89, without properly serving counsel by mail. Naseer says that he indeed sent a copy of these materials by mail and that counsel is lying when he says otherwise. Naseer says that his proof for counsel's receipt of his mailed version is the fact that his request for disbursement of funds for postage to mail his memo was granted by prison officials. But that doesn't prove that the documents were actually received by counsel, and Naseer doesn't present a plausible reason for counsel to be untruthful here.

Naseer contends that McArdle's counsel intentionally failed to provide him with full discovery as retaliation for Naseer's participation as a jailhouse lawyer in another of this court's case in which McArdle is represented by the same counsel she has here. But he doesn't provide evidence supporting that hunch. The court already admonished Naseer for similar unsupported

allegations that opposing counsel has committed misconduct. *See Sierra-Lopez v. LaMarca*, No. 17-cv-599-wmc, 2020 WL 967594, at *2 (W.D. Wis. Feb. 28, 2020). Nothing in Naseer's current filings suggests that McArdle's counsel has intentionally withheld information from Naseer or otherwise violated the discovery rules.

Naseer contends that defendant Alsum gave false testimony by describing her job responsibilities differently than they appear on the official job description, and I take Naseer to be saying that Alsum is lying about her responsibilities in supervising prison medical officials because she is in fact responsible for overseeing medical policies. *See* Dkt. 193. The discrepancies are slight enough to reveal the real issue: that Alsum and Naseer interpret the verbiage in the job-responsibility documents differently. Alsum says that she doesn't directly control employees' treatment decisions, and Naseer appears to think that the supervisory job description should be interpreted to include that level of control. But Alsum was free to explain in her own words what she believes her responsibilities are; at summary judgment, Naseer is free to point out discrepancies between her account and the job description if that helps his case. Those discrepancies are not a reason to sanction Alsum.

In another motion, Dkt. 121, Naseer contends that counsel for the state defendants committed perjury by referring to categories of documents within his medical file by the wrong name, stating that they had sent Naseer his "medical correspondence file," when the official name of that type of document on the DOC's "Health Care Records Request Checklist," Dkt. 83-1, at 8, is the "patient request folder." I take Naseer to be saying that counsel intentionally mislabeled these documents to make it seem as if they had given Naseer his full file when there were still documents missing. This argument is somewhat difficult to follow; Naseer's concern was specific individual documents missing, not entire categories of

documents, so it's unclear how counsel's mislabeling of categories of documents would matter. Naseer seems to think that counsel is trying to trick him, when they simply appear to be referring to certain types of documents by using descriptive names close to but not matching the official name on the checklist form. That isn't cause for sanctions.

Naseer continues to argue that the state defendants failed to include specific documents that should have appeared in the 500-page medical file. But there doesn't appear to be any dispute that the state defendants have attempted to provide Naseer with his whole medical file, including different types of documents like Naseer's own correspondence with officials and his actual treatment chart. It's also undisputed that some records were indeed missing, which I'll discuss below. But there's no evidence that any missing documents were the result of anything other than mistakes by the state defendants or errors attributable to a vendor's document scanning process. So I won't grant that request for sanctions.

As for individual documents missing from the 500-page file, that issue was part of what I addressed in my order regarding Naseer's previous series of discovery and sanctions motions. I granted Naseer's motions to compel in three respects and directed the state defendants to:

- Produce documents showing the physicians who worked in Wisconsin prisons with "maximum security segregation" units.

- Respond to Naseer's assertion that there were documents missing from the 500-page packet of medical care records and explain their efforts to find those documents.

- Respond to Naseer's assertion that the 500-page medical-record packet was in "complete and utter . . . disarray."

Dkt. 123, at 6–8.

The state ultimately responded with information about the DOC's physician roster and "on-call" schedule for various prisons. Dkt. 134-1. Naseer notes that they provided this information ten days later than the deadline I set forth in my order, *see* Dkt. 135, but that's

because Naseer sent additional discovery requests modifying the scope of information that he sought on this issue, *see* Dkt. 130-1. And Naseer wasn't prejudiced by this delay. It isn't a reason to sanction the state defendants.

As for the completeness of Naseer's 500-page medical file, the state defendants have responded with a declaration from Crystal Powers, the DOC's health information supervisor, who says that she checked with WSPF staff to review Naseer's paper medical file and with the vendor that scans inmate correspondence into an electronic file, and she recovered almost all of the documents that Naseer identified as missing. *See* Dkt. 128. The still-missing documents include a page of an interview/information request form that Naseer already had in his possession, and the reverse sides of several interview/information request forms that were not scanned into the vendor's database. Powers believes that the reverse sides of these documents were not scanned because they were blank. The vendor had also scanned 36 additional records since counsel turned over the file to Naseer, so they gave him those additional documents. Naseer doesn't challenge the completeness of the state defendants' supplemental discovery.

That leaves Naseer's assertion that the 500-page medical-record packet was in "complete and utter . . . disarray." The state defendants did not respond to this allegation, as I directed them to. Their failure to do so has no bearing on the outcome of the case: Naseer's summary judgment responses show that he was able to locate the appropriate exhibits for his various arguments. Nonetheless, this court expects parties to comply with its directives. I'll direct the state defendants to follow through on responding to Naseer's allegation about the state of the materials they turned over to him, and to explain why they didn't respond to this aspect of my order the first time around. I'll give Naseer a chance to reply. I'll consider

sanctions depending on the briefing, although Naseer should be aware that any such sanction will be meager given that he appears to have suffered little prejudice.

## B. Motion to revoke in forma pauperis status

Naseer has "struck out" under 28 U.S.C. § 1915(g) and cannot proceed in forma pauperis on claims unless they are supported by allegations that he was in imminent danger of serious physical harm when he filed the complaint. I concluded that Naseer's claims in this case met that standard because he alleged that he suffers from dizziness and severe pain in the back of his head and he said that his "neurons system in [his] brain is shutting down," Dkt. 1, at 3.

The state defendants ask the court to revoke Naseer's in forma pauperis status and dismiss the case unless he pays the full $400 filing fee. Dkt. 138 and Dkt. 151. Defendant McArdle has filed separately to say she joins in the state defendants' motion. Dkt. 143.

Defendants say that Naseer is not really in imminent danger because he filed motions for preliminary injunctive relief about matters unrelated to his head pain but has not sought a preliminary injunction about his head. His numerous filings following his pleadings do not include statements that he continues to suffer from head pain or other disability. At his deposition, Naseer stated that the last time he filed a health service request about his head problems was June 2017; defendants say this shows that he is no longer in imminent danger.

They also say that Naseer is "piggybacking" his Eighth Amendment claim against complaint examiner O'Donnell, his equal protection class-of-one claims, and his First Amendment retaliation claims on his Eighth Amendment claims more directly about his care, stating that none of these other claims "even remotely meet the definition of imminent danger." Dkt. 138, at 3.

I will deny defendants' motions. The imminent danger requirement applies to a plaintiff's status at the time he filed his complaint. So a change in those conditions after filing of the complaint does not affect the imminent danger analysis. *See, e.g.*, *Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003) (plaintiff's transfer away from alleged poor medical care did not moot claim). Whether or not Naseer stopped suffering symptoms after he filed his complaint is irrelevant, although I note that he did indeed ask for injunctive relief in his original complaint (which I dismissed for being too vague to state claims), and Naseer says that he continued to suffer medical problems but he chose not to seek help because he was being ignored.

Defendants contend that this case is similar to *Almond v. Pollard*, No. 12-cv-259-bbc, 2013 WL 4591849, at *3 (W.D. Wis. Aug. 28, 2013), a case in which the court revoked a plaintiff's in forma pauperis status after briefing on the plaintiff's summary judgment and preliminary injunction motions showed that the plaintiff was not suffering from an abdominal infection or other serious problem but instead merely had a hemorrhoid. Here, there has not been rigorous briefing of the facts prior to defendants' summary judgment motions showing that Naseer's perceived health problems are much less serious than he alleged. So *Almond* does not support defendants' motions.

As for defendants' argument that Naseer is piggybacking his other claims onto his imminent danger claims, I do not cut as fine a distinction between the claims as defendants would like. The allegations supporting Naseer's First Amendment and equal protection claims are the same that underlie his Eighth Amendment claims. And the Eighth Amendment claim against O'Donnell is clearly part of his theory that prison officials are denying him adequate medical care. They don't cite any authority for the proposition that Eighth Amendment medical-care claims are the only types of claims that can survive an imminent danger analysis,

and that is not this court's practice. Because the allegations underlying all of Naseer's claims in this case relate to the alleged misconduct leading to him suffering severe pain and dizziness at the time he filed his complaint, he may bring all of those claims in forma pauperis. I'll go on to consider defendants' summary judgment motions.

## SUMMARY JUDGMENT MOTIONS

### A. Undisputed facts

The following facts are undisputed unless otherwise noted.

Plaintiff Hakim Naseer is an inmate at Wisconsin Secure Program Facility (WSPF). Several of the defendants worked at WSPF: defendant Sandra McArdle was a nurse practitioner, defendant Beth Edge was a Nurse Clinician II, defendant Jolinda Waterman was the Health Services Unit (HSU) manager, and defendant Julie Payne was an institution complaint examiner. Defendant Lori Alsum is a registered nurse employed by the DOC's Bureau of Health Services as a regional nursing coordinator. Defendant Cindy O'Donnell works at the DOC's central office in Madison and acts as the "secretary's designee" for the final step of inmate grievance appeals.

Naseer says that he has suffered head trauma in the past: he says that he suffered blunt force trauma to the back of his head in 2007. In 2011, a doctor felt the back of his head and found a dent or "sink hole." But the doctor didn't order further testing because Naseer wasn't complaining of pain.

Two or three times in 2017, Naseer hit his head on a desk in his cell, and I take him to be saying that it exacerbated the injury; he says that "it felt like something ruptured in the back

of my head." Dkt. 150, at 31. If Naseer touched that area on the back of his head, or sometimes when he would shower, he would feel dizzy with stinging or tingling pain.

On February 1, 2017, Naseer was seen by non-defendant Nurse Anderson for his complaint about his old head injury becoming worse and interfering with his sleep. Anderson's report stated that Naseer would not let Anderson palpate the back of his head. Anderson assessed him as having an "alteration in comfort," prescribed him ice three times a day, and set him for an appointment with an advanced care provider. Dkt. 181-10.

At the time of the events in this case, WSPF was the only major DOC prison that did not have an on-site medical doctor. Despite DOC regulations stating that a doctor should be available on-call at all times, Naseer was not assessed by a doctor. Instead, on February 27, 2017, Naseer was seen by defendant Nurse Practitioner McArdle. The parties do not dispute that, generally, a nurse practitioner is qualified to see patients and prescribe medications as a doctor would. McArdle says that she is "capable of assessing neurological symptoms and conditions and determining whether referral to a physician or specialist is necessary or whether diagnostic testing should be performed." Dkt. 176, at 1. Naseer says that McArdle was not fully qualified to assess his problems because she is not certified in "acute care."

McArdle's treatment note, Dkt. 181-6, says the following: she saw Naseer for his complaint of a possible concussion and an old injury to his head. Naseer stated that he occasionally struck his head against the corner of a shelf, exacerbating his old injury. He seemed alert and oriented. She performed a head, eyes, ears, nose, and throat examination. Her palpation of the left crown of his head showed no obvious signs or symptoms of injury. His cranial nerves 2 through 12 were intact. His nasal cavity and throat were inflamed. She diagnosed him with "URTI," which I take to mean upper respiratory tract infection, and

"neurological concerns." She assured him that there were no signs or symptoms of a head injury. She prescribed him nasal spray and Mucinex. She also prescribed him Excedrin for the onset of headaches. Naseer says that McArdle did not write down everything that he said during the appointment, including the doctor's 2011 assessment of his injury and details about why Naseer's injury was feeling worse recently.

On June 8, 2017, Naseer said that he was having a medical emergency. Non-defendant Nurse Nathan Bethel assessed Naseer. Naseer complained that he became dizzy and lightheaded when he stood up or "did sprints." Nurse Bethel wrote that Naseer ambulated, changed position, and talked without difficulty. Nurse Bethel also wrote that Naseer was alert and oriented. Nurse Bethel wrote, "Informed [patient] that this is not a medical emergency. Change position slowly and continue to drink plenty of fluids." Dkt. 165, at 13. Bethel referred Naseer to an advanced care provider.

Five days later, Naseer was seen by defendant Nurse Practitioner McArdle. McArdle says that she evaluated Naseer for complaints he raised, which included dizziness, lightheadedness, and occipital headaches. Naseer said that he also complained of sharp pain in the back of his head causing double vision, and more generally about his head injury. Naseer says that he wanted McArdle to use a needle to remove excessive fluid from the back of his head and to test him for internal bleeding. McArdle's note does not include those issues, *see* Dkt. 181-5, and McArdle says that Naseer did not raise the issue of his head injury at the appointment. McArdle performed a head, eyes, ears, nose, and throat evaluation, including McArdle lightly probing the site of Naseer's purported injury.

McArdle observed that Naseer's ear drums were "dull," and his nasal cavity and throat were inflamed. The remainder of the examination did not reveal any physical abnormalities.

McArdle concluded that Naseer had no neurological symptoms, and he did not need emergency medical attention or diagnostic testing. McArdle assessed Naseer with dehydration, left labyrinthitis (an inner ear disorder), and headaches. McArdle prescribed Naseer Pedialyte for dehydration, meclizine and cetirizine (antihistamines to treat dizziness and skin redness), Excedrin migraine pills, and T/gel shampoo to combat itchy scalp. McArdle told Naseer to drink a lot of fluids, keep his head above his heart, and avoid quick movements. McArdle did not refer Naseer to a doctor.

On June 16, 2017, Naseer submitted a "health service request" form directed to "HSM Offices" (meaning the Health Services manager, defendant Waterman) that stated he "want[ed] to see [the] manager." A health service request is the form that an inmate uses to raise a medical concern, communicate with medical staff, or request to be seen by HSU staff. The requests are triaged by a nurse on first shift and responded to within 24 hours. Nurses use their training and judgment when triaging the requests and prioritizing appointments and inmate needs. Even when a request may be directed to the health services manager, the requests are always triaged in the same manner for patient care and safety. A request directed to a particular staff member cannot be left unread and set aside until that person can review it; HSU staff must assume that a document may contain a request for emergent care that cannot wait. Nurse Bethel forwarded Naseer's request to Waterman because it did not request specific information that Bethel could provide.

Naseer submitted two health service requests on June 20, 2017, directed to "HSM's Office Response." In the first request, Naseer stated he needed to talk to a "certified doctor" or be taken to a neurologist. He also stated, "Your medical staff cannot cure me!" Dkt. 165, at 7. Defendant Nurse Edge responded to this request later that day, noting that Naseer had

been seen a week earlier and was prescribed new medications to address his medical concerns, and that he should continue the new plan of care as discussed with his provider. Edge says that she did not forward the request to Waterman because she was able to provide a response by reviewing Naseer's medical records. Edge concluded that Naseer's complaints had been addressed a week prior and McArdle did not include a referral to a doctor or neurology.

Naseer's second June 20 health service request stated that nurses did not give him his "keep on person" dehydration medication for his headaches while he was on clinical observation status. *Id.* at 8. Defendant Edge responded later that day that his complaint was noted. Edge says that she didn't forward this request to Waterman because nothing else could be done other than reassure Naseer that HSU staff had received the request; HSU staff does not have the authority to overrule security staff on a decision about the property allowed in observation status.

On June 22, 2017, Naseer filed inmate grievance No. WSPF-2017-15895, alleging that he was being denied access to a doctor or a trip to the hospital to see a neurologist. As part of defendant Institution Complaint Examiner Payne's investigation into this allegation, she contacted defendant Waterman and reviewed Naseer's progress notes and prescriber's orders contained in his HSU records.

Payne recommended dismissing the complaint because Naseer was seen by Nurse Practitioner McArdle, who concluded that a neurology consult was unnecessary and instead prescribed Naseer various medications. Payne also noted that Naseer could submit a new health service request if McArdle's plan of care proved ineffective. Defendant Alsum acted as the reviewing authority for the grievance. She accepted Payne's recommendation and dismissed the grievance.

Naseer appealed the dismissal to the office of the DOC secretary. In his appeal, he stated that "a nurse cannot impersonate a doctor's position," and he complained of nurses not properly documenting his appointments. Dkt. 159-2, at 15–16. Corrections Complaint Examiner Brad Hompe (who is not a defendant) recommended dismissing the appeal because defendant Nursing Coordinator Alsum had dismissed the complaint and there was nothing new in the appeal to warrant overturning that decision. Defendant O'Donnell accepted that recommendation. O'Donnell says that she ordinarily reviews the evidence attached in the electronic grievance file.

Naseer also submitted two health service requests on June 22, 2017, addressed to the manager but fielded by Edge. But neither of them was about his head problems: one was about a nurse's delay in assessing his blood pressure, and the other was about the first-shift nurse conducting rounds too early, when prisoners were asleep.

On June 23, 2017, defendant Waterman was passing through Naseer's unit, and he called for her to come to his cell front. Waterman and Nurse Bethel went to his cell front. Waterman entered a note in Naseer's treatment record memorializing the encounter. The note stated that Naseer "[q]uestioned [nurse] responsibility at HSU medical wellness rounds." Dkt. 165, at 4. Waterman also noted that Naseer sought to see a doctor instead of a nurse; Waterman told Naseer that he "had access to HSU through a nurse or [nurse practitioner]" and that there was a doctor shortage in the DOC. *Id.* at 4–5. Naseer said that he wanted to go to the emergency room "the other day" but staff wouldn't send him. Waterman stated that he was assessed appropriately by the nurses and nurse practitioner.

Naseer says that Waterman's note does not contain all the relevant information from the encounter. Naseer says that he showed Waterman a civil complaint packet naming some

of the nurses she supervised as defendants and that he asked more specifically why nurses weren't making weekly rounds. The parties also agree that Naseer also asked to see a neurologist and that Waterman told him that he did not have a referral to see one.

Also on June 23, 2017, Naseer submitted another grievance, stating that nurses were not adequately documenting all his concerns relating to his head pain. Defendant Payne returned it to Naseer, stating that Naseer had already met his weekly allotment of two grievances under DOC regulations. Naseer notes that this rule has exceptions for grievances concerning personal safety.

Three days later, Naseer filed another grievance about improper medical documentation and also about Waterman's failure to help him. This grievance was accepted for filing and given the number WSPF-2017-16095. But Payne rejected it for failing to meet the grievance regulation requiring "sufficient facts upon which redress may be made." Defendant Alsum upheld that rejection.

June 2017 was the last time that Naseer filed a grievance regarding headaches. But Naseer continued to seek refills for his prescribed medications to combat dizziness, and in November 2017, he filed a health service request stating that he continued to suffer dizziness. Naseer also says that he and McArdle discussed his head problems at a July 2018 appointment that was originally scheduled regarding a wrist injury that Naseer had suffered. McArdle denies that they discussed his head problems at that appointment.

## B. Analysis

Naseer brings claims under several theories:

- Eighth Amendment claims against defendants McArdle, Edge, Waterman, Alsum, Payne, and O'Donnell for failing to provide him with adequate medical care.

- Equal protection "class of one" claims against Waterman and Alsum for singling him out by denying him medical care or failing to intervene in his medical care.

- A First Amendment mail-interference claim against Edge for intercepting his correspondence to Waterman.

- A First Amendment retaliation claim against Waterman for failing to treat him because he showed her a proposed lawsuit against nurses.

The two groups of defendants move for summary judgment on the merits of all of these claims. Dkt. 153 and Dkt. 171. Defendant McArdle has also filed a motion for summary judgment based on exhaustion grounds, Dkt. 166, which I'll address first.

### 1. Exhaustion

McArdle notes that at Naseer's deposition, he discussed what he believes is inadequate treatment by McArdle at their February 2017 appointment, the first of their two meetings. But Naseer did not file an inmate grievance about that appointment. McArdle contends that this means that any claims regarding decisions McArdle made at the February 2017 meeting should be dismissed for Naseer's failure to exhaust his administrative remedies. Under the Prison Litigation Reform Act, prisoners must exhaust all available administrative remedies before filing a lawsuit in federal court about prison conditions. 42 U.S.C. § 1997e(a).

I'm not convinced that McArdle's argument is correct, because case law suggests that an inmate might be able to exhaust claims going back in time if the inmate successfully exhausts a grievance at the end a pattern of continuing misconduct. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). So a June 2017 grievance about McArdle's misconduct might exhaust claims about the February 2017 appointment. In any event, I need not resolve whether *Turley* applies to the claims here. I will deny the exhaustion motion as moot because even if Naseer's claims about February 2017 were properly exhausted, he loses on the merits of all of his claims.

## 2. Eighth Amendment

Naseer alleges that each of the defendants failed to help him get adequate medical care for his head problems.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

### a. Defendant McArdle

I'll start with defendant McArdle, who was Naseer's advanced care provider regarding the head injury: she saw him in February 2017 and June 2017. Naseer says that McArdle violated his rights by failing to make an appointment with a doctor or arrange for neurological testing.

McArdle contends both that Naseer did not have a serious medical need and that she did not consciously disregard his health. Similar to defendants' argument about revoking Naseer's in forma pauperis status, McArdle argues that Naseer didn't have a serious medical need because he stopped making medical requests about his head problems after he filed this lawsuit. But the question on the Eighth Amendment claims is whether Naseer had a serious medical need at the times he was treated by McArdle. Even if Naseer's symptoms later subsided, Naseer's reported symptoms would be a serious medical need—he said that he suffered severe pain and dizziness directly from what he believes is a skull injury. At the summary judgment stage I can't assess Naseer's credibility regarding his self-reported symptoms. And in any event, Naseer says that his symptoms have not totally subsided and that the reason he stopped asking for medical help is that he is dissatisfied by the treatment he received from prison staff and he doesn't think that they will help him. There's a genuine dispute of material fact about the severity of Naseer's problems, so McArdle's argument on the serious-medical-need element of his Eighth Amendment claim fails.

But I will grant McArdle's motion for summary judgment because Naseer fails to present evidence showing that she consciously disregarded his problem. In February 2017, McArdle examined Naseer's head and told him that there were no signs of an injury. She prescribed him medication for a respiratory infection and ordered him Excedrin for headaches. Then in June, after another examination, McArdle diagnosed his dizziness as being caused by dehydration or by an inner-ear problem: she prescribed him an electrolyte drink for dehydration, medication for dizziness, and more Excedrin. She says that her examination showed no need for further diagnostic testing.

So the records show that McArdle examined Naseer twice and treated the problems she diagnosed him with. Naseer disagrees with McArdle's diagnoses, but even if McArdle misdiagnosed him, that type of mistreatment usually supports only a negligence claim under state law. *Gutierrez*, 111 F.3d at 1374 ("medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim"). A defendant medical professional who provides some care to an inmate could still violate the Eighth Amendment if the professional's actions were a substantial departure from accepted professional judgment. *See Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). But Naseer does not provide evidence that could lead a reasonable jury to come to this conclusion.

For instance, I take Naseer to be saying that because McArdle was a nurse practitioner, she was not qualified to make these decisions and should have referred him to a doctor instead. McArdle says that her education and experience makes her capable of assessing both acute and chronic neurological conditions and determining whether a referral to a physician or specialist is necessary or whether diagnostic testing should be performed. Naseer attempts to dispute this by noting that McArdle concedes that she does not hold a certification in "acute care." But he does not explain what this certification means or how it could raise a reasonable inference that McArdle was unable to assess neurological problems.

Naseer also produces DOC policies stating that each nurse practitioner must work in a "collaborative relationship" with a doctor and that DOC facilities are supposed to have a doctor available by telephone at all times. *See* Dkt. 181-4, at 3; Dkt. 181-18, at 3. But Naseer doesn't provide any evidence explaining what "collaborative relationship" means, nor does he explain why he thinks that nurse practitioners must clear all of their decisions with a doctor—the on-call-physician policy appears to be geared toward making physicians available to nurses, not

available to other advanced care providers like nurse practitioners. And even if McArdle or WSPF violated those policies in some way, a policy violation is not itself an Eighth Amendment violation. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). There is no evidence in the record suggesting that McArdle acted outside the scope of her duties such that a reasonable jury could conclude that her actions were a substantial departure from accepted professional judgment.

Naseer also states that McArdle did not fully document the appointments in her progress notes; for instance, in her February 2017 note, McArdle stated that Naseer was complaining about an "old injury" to his head but she didn't recount Naseer's entire explanation of that injury. In June 2017, McArdle examined Naseer's eyes as part of her assessment, but McArdle did not write down that Naseer complained of double vision. McArdle also prescribed Naseer shampoo to treat his itchy scalp, but she didn't include that in her treatment note. Despite these omissions or discrepancies in the treatment notes, Naseer does not explain how they show that McArdle consciously disregarded his problems; it's undisputed that McArdle examined his head and didn't find any sign of injury. These notes are meant be summaries, not verbatim reconstructions of conversations between the patient and medical provider.

I take Naseer to be saying that McArdle intentionally sabotaged later treatment decisions by not writing the full extent of his problems. But that's not a reasonable inference from the face of the treatment notes—which do discuss Naseer's statements about a physical injury to his head—and he doesn't provide any other evidence suggesting why he thinks this was McArdle's motivation. Naseer's objections to McArdle's treatment are not enough to support an Eighth Amendment claim, so I will grant McArdle's motion for summary judgment.

### b. Defendant Edge

Naseer alleged that defendant Nurse Edge intercepted "complaint correspondences" about his treatment meant for Health Services Manager Waterman. Dkt. 32, at 3. At summary judgment, the evidence shows that Naseer is talking about health service requests he addressed to Waterman.

In the weeks following his June 2017 meeting with defendant McArdle, Naseer filed five health service requests addressed to the "HSM's [health service manager's] Office." Three of those were about his head problems. Nurse Bethel forwarded one asking to speak with the health services manager to Waterman. Edge reviewed the other two and responded herself rather than forwarding them to Waterman. She responded to Naseer's request to see a doctor by telling him that he should follow defendant McArdle's treatment plan, which had been issued a week before. And she told him that she received his complaint about being denied his keep-on-person dehydration medication while he was in clinical observation status.[1]

Naseer interprets Edge's responses as her blocking his complaints about medical staff to Waterman, harming his treatment. He contends that prison policy mandates that Waterman respond to those grievances because her job description as health services manager states that she should "[a]nswer pre-filing and first and second step grievances, as appropriate." Dkt. 181-13, at 2. As with his claim against McArdle, Naseer's focus on prison policy is misplaced. And no reasonable jury could conclude that Edge actually violated those policies here. The health service requests weren't grievances, as Naseer implies, but even assuming that they could be considered "pre-filing" materials, that policy says that Waterman should respond

---

[1] Naseer says that in 2018 Edge failed to forward several other requests to Waterman. But those requests were not about Naseer's head problems so they are not relevant to this lawsuit.

to them "as appropriate." Under DOC medical policies, the front-line nurses triage health service requests and respond to them, just as Edge did here.

Naseer also doesn't show that he was harmed by Edge's actions or even that Edge intended harm. Edge didn't change anything about Naseer's treatment after he complained, but she didn't have the power to overrule Nurse Practitioner McArdle's decisions, and there's no evidence that Waterman could do so either. The same is true with Naseer's request about his dehydration medication: the state defendants say that neither Edge nor Waterman could overrule an observation-status property restriction. So I will grant summary judgment to the state defendants on this claim.

### c. Defendant Waterman

Naseer alleged that in June 2017, defendant Waterman told him that he could not be seen by a doctor because of a doctor shortage within the DOC, and she "refused to enforce the referral-to-a-certified-doctor procedures and documentation duties." Dkt. 32, at 4. The parties focus on Waterman's June 23, 2017 discussion with Naseer as she was passing through his unit. Naseer wanted to see a doctor; Waterman responded that there was a doctor shortage, and that he could still see nurses or a nurse practitioner. Naseer said that he recently wanted to go to the emergency room to see a doctor; Waterman responded that there was no need for that because the treatment he had already received from nurses and Nurse Practitioner McArdle were appropriate. The parties also agree—although it is not in Waterman's entry in Naseer's treatment notes—that Naseer also asked to see a neurologist and that Waterman told him that he did not have a referral to see one.

So it's undisputed that Waterman did not arrange for Naseer to see a doctor. But the real question is whether this could show that Waterman disregarded Naseer's health. Naseer

has provided no evidence suggesting that Waterman had a duty to consider overruling McArdle by making a referral to a doctor, or even if she could, that she knew that Naseer needed a referral and that he would be harmed without one. Waterman does not treat patients; she relies on the treatment decisions of the medical professionals directly treating patients. She relied on McArdle's assessment from only ten days earlier that no referral to a doctor was necessary, whether the referral be to a DOC physician or an outside neurologist. Because no reasonable jury could conclude from these facts that Waterman acted with conscious disregard to Naseer's health, I will grant the state defendants' motion for summary judgment on this claim.

### d. Defendants Payne, Alsum, and O'Donnell

Naseer brings Eighth Amendment claims against defendants Payne, Alsum, and O'Donnell, all of whom reviewed grievances that Naseer filed about the medical care he received for his head problems. All three of these defendants reviewed Naseer's '15895 grievance about being denied access to a doctor. Payne recommended dismissing that grievance after meeting with Waterman. Payne stated that although WSPF did not have an on-site doctor, Nurse Practitioner McArdle was qualified to assess patients and then refer a patient to a doctor if need be. Alsum accepted Payne's recommendation to dismiss, and O'Donnell dismissed Naseer's appeal.

Naseer cannot maintain Eighth Amendment claims against these defendants merely for ruling against him on his grievance; he needs to set forth facts and evidence raising a reasonable inference that they acted with conscious disregard toward him. Naseer fails to do so. All the record here shows is that defendants reviewed the grievance materials and medical records and concluded that Naseer was receiving proper care. They did not violate the Eighth Amendment by failing to intervene further. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (Claim

against complaint examiner fails where prisoner "has not accused [examiner] of refusing to do her job and of leaving the prisoners to face risks that could be averted by faithful implementation of the grievance machinery. He contends, instead, that [examiner] should be held liable because she carried out her job exactly as she was supposed to.").

Naseer's claim against O'Donnell is slightly different: I granted Naseer leave to proceed on a claim against O'Donnell for denying the appeal of this grievance for failing to provide new information on appeal, despite acknowledging "off the record" that the corrections complaint examiner lied when he recommended denying the appeal for that reason. *See* Dkt. 123, at 9. But at summary judgment, Naseer does not provide any evidence suggesting that O'Donnell dismissed the appeal for false reasons. He does not support his allegation about an off-the-record-conversation with any evidence of that conversation. Instead, he now contends that he raised a new argument on the grievance appeal that nurses failed to properly document his appointments, and that in dismissing the appeal, O'Donnell failed to follow Wisconsin Administrative Code § DOC 306.04 ("[e]very employee of the department is responsible for the safe custody of the inmates confined in the institutions").

I've already explained that a violation of DOC policies does not in itself violate the Eighth Amendment, so Naseer's argument about § DOC 306.04 is meritless. Naseer has failed to submit evidence supporting his original allegation about his off-the-record conversation with O'Donnell suggesting that she dismissed the appeal for false reasons, so that theory can't support an Eighth Amendment claim. As with defendants Payne and Alsum, the evidence shows only that O'Donnell considered the grievance materials and dismissed the appeal so there's no evidence of wrongdoing that could violate the Eighth Amendment.

Naseer also brings a claim against defendant Institution Complaint Examiner Payne for a separate grievance attempt he made after the '15895 grievance. Naseer complained that nurses were not properly documenting the details of his appointments. Payne returned the grievance for exceeding the two-grievance per week limit. Naseer says that Payne should have accepted the grievance because DOC regulations allow for exceptions to the rule for grievances about personal safety. But as I've explained, whether Payne properly followed DOC rules isn't an Eighth Amendment issue. The real issue is whether Payne's actions showed his conscious disregard of Naseer's medical needs. Naseer provides no evidence showing that Payne was trying to harm him. Rather, the evidence shows that Payne accepted other grievances by Naseer, including the '15895 grievance and another grievance about medical documentation only three days after she returned the June 23 attempt. She ruled against Naseer on both of those other grievances, but only after considering the issues raised by Naseer and after speaking with Waterman. And there was review of both of those rulings; Payne wasn't squelching Naseer's efforts by burying all of his complaints. Naseer has only speculation that Payne was doing anything other than reviewing his grievances in good faith. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

Because Naseer fails to show that any of the grievance-examiner defendants consciously disregarded his medical needs, I will grant the state defendants' motion for summary judgment on each of these Eighth Amendment claims.

### 3. Class-of-one equal protection

I granted Naseer leave to proceed on "class of one" equal protection claims against Waterman and Alsum for singling him out by denying him medical care or failing to intervene in his medical care. But at summary judgment, Naseer concedes that he was not actually singled out for mistreatment. Rather, he says that all WSPF prisoners were treated unfairly because they did not have a doctor on staff at WSPF, unlike the other DOC maximum-security prisons. Instead they received care from defendant McArdle or other nurse practitioners. But even assuming that the lack of a doctor directly on staff at WSPF could form the basis of an equal protection claim, Naseer's claims against Alsum and Waterman go nowhere because there is no evidence that they have any control over hiring a doctor at the prison. So he fails to show that they had any personal involvement concerning any discriminatory conduct. I'll grant the state defendants' motion for summary judgment on these claims.

### 4. First Amendment mail interference

I allowed Naseer to proceed with a First Amendment claim against defendant Nurse Edge for what he called denial of his outgoing mail. At summary judgment it is clear that the correspondence at issue was not mail but rather the health service requests he addressed to Waterman that Edge responded to instead. I've already concluded above that there is no evidence that Edge intended to "intercept" the requests to thwart communication with Waterman and harm him; rather, she triaged the requests and responded to them as a front-line nurse. So I'll grant the state defendants' motion for summary judgment on this claim. *See Brokaw v. Mercy County*, 235 F.3d 1000, 1012 (7th Cir. 2000) (explaining that all section 1983 claims require a showing of "deliberate or reckless disregard of plaintiff's constitutional rights" (internal quotation omitted)).

### 5. First Amendment retaliation

In addition to his Eighth Amendment claim against defendant Waterman, Naseer brings a First Amendment retaliation claim against her: he alleges that she failed to have him seen by a doctor because Naseer threatened to file a lawsuit against WSPF medical staff.

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) the defendant acted in a way that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in the defendant's decision to take that action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Even if I assume that Naseer has met the first two elements—that Naseer showing Waterman a copy of his proposed lawsuit is protected speech and that a person of ordinary firmness would be deterred from such speech in the future because Waterman didn't help him—he fails to create a disputed issue of material fact on the question of Waterman's motivation.

Naseer has the same problem with this claim as he does with his Eighth Amendment claim: he has provided no evidence suggesting that Waterman's role included overruling the treatment decisions of the medical professionals on staff or that such a step was necessary in his case. Without some evidence that Waterman's inaction was caused by her knowledge of Naseer's threatened lawsuit, rather than her deference to the McArdle's recent diagnosis and treatment plan, all Naseer is doing is guessing that Waterman meant to retaliate against him. Naseer's mere speculation is not enough for a reasonable jury to find in his favor on the retaliation claim. So I will grant the state defendants' motion for summary judgment on this claim.

Because I am granting summary judgment to defendants on each of Naseer's claims, the entire case will be dismissed. Defendant McArdle's motions in limine, Dkt. 201–206, will be denied as moot.

ORDER

IT IS ORDERED that:

1. Plaintiff Hakim Naseer's motions to compel discovery, Dkt. 107 and Dkt. 121, are DENIED.

2. Plaintiff's motions for sanctions, Dkt. 107; Dkt. 121, Dkt. 135; Dkt. 193, are DENIED.

3. The state defendants may have until April 16, 2020, to respond to this order regarding plaintiff's assertion about the state of the medical-record file they produced to him. Plaintiff may have until April 30, 2020, to file a reply.

4. Defendants' motions to revoke plaintiff's in forma pauperis status, Dkt. 138; Dkt. 143; Dkt. 151, are DENIED.

5. Defendant Sandra McArdle's exhaustion-based motion for summary judgment, Dkt. 166, is DENIED as moot.

6. Defendant McArdle's merits-based motion for summary judgment, Dkt. 171, is GRANTED.

7. The state defendants' motion for summary judgment, Dkt. 153, is GRANTED.

8. Defendant McArdle's motions in limine, Dkt. 201–206, are DENIED as moot.

9. The clerk of court is directed to enter judgment for defendants.

Entered April 1, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge